# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 17, 2008

## STATE OF TENNESSEE v. IWANDA ANITA BUCHANAN

**Direct Appeal from the Circuit Court for Bedford County**
**Nos. 16309, 16322-16324   Robert Crigler, Judges**

---

### No. M2007-02870-CCA-R3-CD - Filed October 6, 2008

---

The Defendant pled guilty to four counts of selling .5 grams or more of a Schedule II drug and one count of possession of .5 grams or more of a Schedule II drug for resale. The trial court sentenced her as a Range II, multiple offender to an effective twenty-seven year sentence. On appeal, the Defendant argues that the trial court erred by sentencing her as a Range II offender. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and J.C. MCLIN, JJ., joined.

Andrew Jackson Dearing, III, Shelbyville, Tennessee, for the Appellant, Iwanda Anita Buchanan.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Charles F. Crawford, Jr., District Attorney General; Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

#### A. Guilty Plea Hearing

At the plea acceptance hearing, the State recited the following facts as the basis for the

Defendant's guilty plea:

First in case 16309 those event occurred on April 18, 2007. Agents of the Drug Task Force met with the confidential informant who indicated that the confidential informant or the confidential informant indicated that an individual known by the street name Pumpkin, who is the defendant, she knew her as Iwanda Buchanan but she goes by the street name Pumpkin was involved in the illegal distribution of crack cocaine.

The confidential informant agreed to assist the Drug Task Force in a targeting effort against the defendant. On that date, first a recorded telephone call was placed to the defendant propositioning her to sell $100 worth of crack cocaine. A time and place was set up for that transaction to occur. Agents of the Drug Task Force as well as city police officers then set up surveillance on the defendant's residence. They actually observed her come home a short time before the transaction occurred. They then observed the confidential informant arrive. I will say the confidential informant was searched before the transaction and the vehicle that was to be used by the confidential informant was searched and that met with negative results.

The confidential informant was provided a transmitter and $100 in Drug Task Force funds. The confidential informant went into the defendant's residence and handed the defendant $100. Received in exchange a quantity of crack cocaine. The confidential informant then departed and met back up with the task force agents and turned that over to them. That was sent to the lab. It was crack cocaine weighing one gram.

In case number 16322, those events occurred on April 20, 2007. Again this was a confidential informant working with agents of the Drug Task Force. They had the confidential informant place a recorded and monitored telephone call to the defendant about a possible drug transaction and a time and place was set up for that to occur. They then searched the informant and the informant's vehicle and that met with negative results. They then provided the informant with $100 in prerecorded funds and a transmitter to record the transaction.

The events actually occurred and took place at the Magic Spray Car Wash on Colloredo Boulevard. The defendant went through the car wash but as soon as the vehicle came through the car wash she got out, the confidential informant approached, or excuse me. The defendant stayed in the vehicle and the confidential informant approached the driver's side of the defendant's vehicle wherein the confidential informant handed $100 to the defendant. The defendant handed back

a quantity of suspected crack cocaine. The confidential informant noticed that the crack cocaine came from a larger piece of crack cocaine that the defendant had in her possession. The confidential informant returned to the task force agents and relinquished to them the drugs that had just been purchased. That was sent to the lab and it weighed 6 tenths of a gram.

In case number 1632[3], those events occurred on April 25, 2007. Again, much like the other events, the agents met with a confidential informant; a monitored and recorded telephone call was placed to the defendant to set up a drug deal at the time for $100. They searched – and this time the transaction was to take place in the confidential informant's home. The agents searched the confidential informant and the area around the confidential informant. That met with negative results.

They then provided her with $100 and a transmitter. Agents then took up various surveillance positions including inside the confidential informant's residence. They were actually able to see the defendant walk away from her residence to the CI's residence. They were actually able to see the defendant enter. She was carrying a small child in her arms. The defendant then produced a quantity of crack cocaine from a pocket and broke off a piece of it. Set it on a table and received $100 in return and the defendant and her child then walked back to their residence. The agents of course then stepped out and took possession of the crack cocaine involved in that transaction. It was sent to the lab. It weighed five tenths of a gram.

Lastly in case number 16324, these events took place on April 27, 2007. The agents again met with the confidential informant. The confidential informant had already had some conversation with the defendant about a drug transaction. They then had the confidential informant place an additional telephone call to confirm that. They then searched the confidential informant and the confidential informant's vehicle and that met with negative results. They provided a transmitter. They provided $100 in prerecorded funds. The confidential informant then under the surveillance of the agents went to the area around what we call the GoodWill store and the Dollar Store. And the defendant was observed entering the confidential informant's vehicle.

The defendant received $100 from the confidential informant and the defendant handed over to the confidential informant a quantity of crack cocaine. The defendant was then observed exiting the confidential informant's vehicle. The confidential informant then met back up with the task force agents; the agents received the drugs that had been involved in the transaction. They had been – they were sent to the lab. They weighed seven tenths of a gram. That is as to count 1 of 16324.

Later on that same day agents of the Drug Task Force observed the defendant driving her Nissan Altima. I think in almost all of these transactions they had seen the Nissan Altima. Perhaps except for the one where the defendant and her child came to the CI's residence. They were familiar with her vehicle. They see her. They are familiar with her. They actually conducted a traffic stop of her in order to arrest her for all of these previous sales. As they approached her vehicle, they got her out of the vehicle. They also removed a purse from inside of her vehicle and she actually attempted to grab that away from them. And there turns out there were two plastic bags in the purse. There was a little bit of a struggle for the purse. She was immediately handcuffed and the plastic bags, one contained a quantity of crack cocaine and the other one contained a quantity of marijuana. They also seized from her person $1002 in US currency and they also seized an additional $200 from inside of the vehicle for a total of $1202.

They had a search warrant for her home. They conducted a search at her home that day. I believe they used Officer Tracy Nelson and her K-9, and believe another quantity of crack cocaine was seized from her person. There was a marijuana grinder; a marijuana smoking pipe and a small amount of marijuana was seized from her house.

They interviewed the defendant first by administering her Miranda rights. She understood those and waived those. She indicated to the task force agents that she had been selling crack cocaine on a regular basis for approximately the last four to six months. She normally purchased quarter ounce or half ounce quantities from her source. She would then sell the crack in much smaller quantities to customers at the street level. She indicated she could normally make a profit of $400 for each half ounce of crack that she purchased. She gave the name of her source of supply. She indicated that she had been renting vehicles and in fact the Nissan Altima was a rental. She indicated she normally made about $800 per week selling crack cocaine. She said just that day she had already made $400 selling crack cocaine. She was asked if she had any other employment at that time and she indicated sometimes she cuts hair and makes a little bit of money from doing that. She was asked if she had a filed a federal tax return for 2006; she indicated she did not.

The Defendant agreed that these facts were true and pled guilty to four counts of selling .5 grams or more of a Schedule II drug and to one count of possessing .5 grams or more of a Schedule II drug with the intent to resell.

## B. Sentencing Hearing

At the sentencing hearing, the following evidence was presented: Timothy Lane, the Director

of the 17th Drug Task Force, testified that his agency investigates and prosecutes drug crimes.  He stated that crack cocaine was the main problem that his agency faced.

The Defendant testified that she was forty-four years old and was living by herself when she was arrested.  She said she earned some income from braiding and cutting hair.  The Defendant admitted being addicted to crack cocaine for "about 18 years."  She said she "changed [her] life" three years before the sentencing hearing and began going to church.  The Defendant acknowledged that her addiction to crack cocaine was life-long.  She did not graduate from high school and said she was laid off from work due to high blood pressure.  The Defendant said she would like to not be in jail because she was "tired" and would like to teach her grandson to not be in jail.

On cross-examination, the Defendant clarified that she had not used crack cocaine in three years.  She admitted to having a friend's child with her one time when she sold crack cocaine.  The Defendant said that her son is in the Tennessee Department of Correction for selling cocaine.  She admitted being convicted of robbery and aggravated assault in 1995.  After serving a period of incarceration, she subsequently violated her parole several times.  The Defendant stated, "I am not the same person that I was then.  Back then I didn't care . . . . But today it is not like that."

The trial court ordered the Defendant to serve concurrent thirteen-year sentences for cases 16309, 16322, and 16323.  The trial court ordered concurrent fourteen-year sentences for the two counts in case 16324.  The thirteen-year sentences were to be served consecutively to the fourteen-year sentences, creating an effective twenty-seven-year sentence.  It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant argues that the trial court erroneously sentenced her as a Range II, multiple offender.  Specifically, the Defendant argues that her prior convictions for robbery and aggravated assault, which were committed on the same day, should not count as separate convictions for purposes of establishing the range.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  T.C.A. § 40-35-401(d) (2006).  As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper.  T.C.A. § 40-35-401, Sentencing Comm'n Cmts.  This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (2006), we may not disturb the sentence even if a different result was preferred.  *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001).  The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts.  *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001);

5

*State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

The defendant argues that the trial court should have sentenced her as a Range I "standard offender" rather than as a Range II "multiple offender." A "standard offender" is "a defendant not sentenced as: (1) a multiple offender." T.C.A. § 40-35-105 (2006). "A 'multiple offender' is a defendant who has received: (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." T.C.A. § 40-35-106(a)(1) (2006). Additionally, the Tennessee Code provides that

> In determining the number of prior convictions a defendant has received: . . . [e]xcept for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions.

T.C.A. § 40-35-106(b)(4) (2006). The Sentencing Commission Comments shed further light on this exception by providing the following pertinent example, "if the defendant was convicted of robbing several people in the same store, such would constitute separate convictions for enhancement purposes for a new violation of the law." T.C.A. § 40-35-106. The Commission then reasoned that separating the convictions "is in accord[ance] with the policy of giving greater "weight" to crimes of violence." T.C.A. § 40-35-106.

The trial court in this case found the Defendant to be a Range II, multiple offender because she had been convicted of aggravated assault and robbery from an event that transpired on July 1, 1994. Addressing the two prior convictions, the trial court said, "Aggravated assault either involves a deadly weapon or infliction of serious bodily injury. Robbery certainly, the elements involved in that, include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims." The court continued, "I believe that those two convictions, agg[ravated] assault and robbery would constitute two under that statute and make her a Range II offender."

On review, we conclude the trial court properly sentenced the Defendant as a Range II, multiple offender. She has convictions for robbery and aggravated assault from an event on July 1, 1994. Robbery is a Class C felony, and it is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2006). Aggravated assault is a Class C felony and occurs when a person "intentionally or knowingly commits an assault as defined in § 39-13-101 and: (A) causes serious bodily injury to another; or (B) Uses or displays a deadly weapon." T.C.A. §39-13-102 (2006). Assault is when a person "(1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offense

6

or provocative." T.C.A. § 39-13-101 (2006). Both robbery and aggravated assault contain elements that the defendant cause or threaten to cause bodily injury. As such, even if a defendant committed both crimes during the same transaction, they would count as separate prior convictions when determining the Range of a defendant. While the Defendant in this case was convicted of robbery and aggravated assault arising from the same transaction, the trial court properly counted the convictions as separate prior convictions. Because the Defendant had two prior convictions of Class C felonies, and her present convictions were Class B felonies, she was a Range II, multiple offender. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude the trial court properly sentenced the Defendant. As such, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE